**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James SCOTT, Defendant-Appellant.**

**No. 74–2279.**

United States Court of Appeals,
Sixth Circuit.

July 3, 1975.

Thomas E. Jackson, Federal Defenders Office, Kenneth Sasse, Detroit, Mich., for defendant-appellant.

Ralph B. Guy, U. S. Atty., Loren G. Keenan, Detroit, Mich., for plaintiff-appellee.

Before PECK and MILLER, Circuit Judges, and ALLEN,* District Judge.

WILLIAM E. MILLER, Circuit Judge.

On December 5, 1973, the defendant, James Scott, was indicted for armed bank robbery and for the forcible abduction of a person during the commission of the offense, in violation of 18 U.S.C. §§ 2113(a), (d)[1] and 2113(e).[2] Trial was

---

\* The Honorable Charles M. Allen, United States District Judge for the Western District of Kentucky, sitting by designation.

1. 18 U.S.C. § 2113. Bank robbery and incidental crimes

    (a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or

    Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or build-

ing, or part thereof, so used, any felony affecting such bank or such savings and loan association and in violation of any statute of the United States, or any larceny—

    Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

.    .    .    .    .

    (d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both

2. 18 U.S.C. § 2113

.    .    .    .    .

    (e) Whoever, in committing any offense defined in this section, or in avoiding or at-

held in district court from May 21 to June 12, 1974, and the jury returned a guilty verdict on June 13.[3] For his part in the crime, Scott was sentenced to serve concurrently 15 years on each of the two counts of the indictment. The defendant now raises several substantial issues on direct appeal.

The material facts are that on September 11, 1973, at approximately 1:45 p. m., three armed men robbed a branch office of the Detroit Bank and Trust Company. After entering the building, one man stood guard at the door and another held a customer at gunpoint, while a third member of the group emptied the cash drawers. The robbers then took the customer as a hostage and fled to an awaiting automobile driven by a fourth individual. After eluding pursuing police vehicles, the men abandoned the get-away car and released their hostage unharmed.

According to the government's theory, James Scott was the robber who held the customer at gunpoint in the bank and later dragged her from the building to the car. Essentially, the government's case was comprised of eyewitness identification and the testimony of the get-away driver and government witness, Lanaro Green. In his defense, Scott produced two witnesses who claimed that the defendant had been with them during the time of the robbery. On appeal, the defendant challenges the propriety of the out-of-court identification procedures used by the F.B.I. He further claims that he was denied access to a key government witness and that he was not given a speedy trial.

## A.  Pretrial Identification

F.B.I. agents came to the bank late in the afternoon on the day of the robbery to show several employees a group of photographs of possible suspects. Four employees, all of whom later testified at trial, either positively or tentatively selected the photograph of James Scott as having been one of the robbers. The photographic spread used by the authorities contained seven pictures.[4] Six of these were typical "mug shots" in that they provided a front and profile view of the subject, along with the name of a law enforcement agency and a date and identification number. However, the remaining picture was obviously not a police "mug shot" but a personal snapshot of a group of persons. It showed the defendant in the company of another man and two women. In the picture the defendant wore a large hat[5] and appeared to be quite a bit taller than the other individuals in the group.

In their descriptions to the authorities, the witnesses to the crime noted that one of the participants was very tall and had worn a large hat. Because these same characteristics were prominent in the photographic display, Scott claims a denial of due process on the ground that the spread was unduly suggestive and hence, that there was a substantial likelihood of misidentification. After a hearing on the defendant's motion to suppress the testimony regarding the photographs, the district court overruled this contention and permitted the witnesses to testify about the pretrial identification and to identify Scott at trial.

The principal case on the subject of photographic displays is the Supreme

tempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years, or punished by death if the verdict of the jury shall so direct.

3.  Scott was tried jointly with two other defendants indicted for the same offense.

4.  The record reveals that seven pictures were introduced at the suppression hearing as government exhibits nos. 3 through 9. Inexplicably, the record on appeal contains only exhibits nos. 3 through 8. However, from the transcript it is clear that the missing photograph is a "mug shot" and not a group picture or personal snapshot.

5.  It must be noted that none of the subjects in the six "mug shots" was wearing a hat of any kind.

Court's decision of *Simmons* v. *United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). There the Court balanced the potential for misidentification against the desire for swift apprehension of criminals. Accordingly, the Court held:

that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Id.* at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253.

This Circuit's most recent application of the *Simmons* decision is in *United States* v. *Clark*, 499 F.2d 889 (6th Cir. 1974), *cert. denied*, 420 U.S. 910, 95 S.Ct. 830, 42 L.Ed.2d 840 (1975). In that case an eyewitness to a robbery gave the police a detailed description of the perpetrator soon after the crime was committed. Later that day the witness was shown an array of pictures from which she selected the robber's photograph. This Court found that the display was suggestive because Clark's photograph was obviously not a "mug shot" and because the pictures of the other subjects did not reflect the defendant's distinctive features (i. e. his age, and his "droopy" moustache). Nevertheless, the Court relied on the totality of the surrounding circumstances to conclude that there was not a substantial likelihood of misidentification. Both the opportunity for the witness to observe the subject during the crime and the absence of any F.B.I. attempt to pressure or influence the witness' selection were critical factors. 499

F.2d at 892; *see also Neil* v. *Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

In the present case, we have viewed the pictures in question, which were made a part of the separate [6] record as government exhibits. To the extent that the group photograph of the defendant emphasized both his height and his wide-brimmed hat, we find that the spread was suggestive. We conclude, however, that there were several countervailing factors that militated against any substantial likelihood of misidentification. *See United States* v. *Clark*, 499 F.2d at 892; *see generally* Annot., 39 A.L.R.3d 1000 (1971). First, the defendant wore no mask while participating in a daylight crime. Secondly, the robbery lasted a matter of minutes during which time the defendant was undoubtedly the center of attention since he held a hostage at gunpoint. Cf. *Coleman* v. *Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). Thirdly, the identification procedure was conducted within a few hours of the crime [7] while the memories of the witnesses were still fresh.[8] Fourthly, the selection of the witnesses was not influenced by any suggestions from the F.B.I. nor were the witnesses permitted to discuss their choices among themselves until after all of them had viewed the spread individually. Finally, all of the witnesses who testified at the suppression hearing and before the jury were firm in their position that their in-court identifications of Scott were based on what they had observed during the robbery and not from what they saw in the picture. Moreover, there were no discrepancies between the defendant's actual appearance and the descriptions given by the witnesses im-

---

**6.** The separate record refers to those proceedings conducted to determine the constitutionality of the photographic display.

**7.** Although Scott may have been in the custody of some agency at the time of the picture spread, there is no indication that the F.B.I. agents conducting the array were aware of that fact. As a result, they were operating under the impression that time was of the es-

sence in order to apprehend a felon at large. Under the circumstances, they did not have time to search for the least suggestive photograph of Scott. *See Simmons* v. *United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

**8.** After the robbery the witnesses gave substantially the same general description of Scott—his age, height, weight and clothing.

mediately following the robbery, nor did the witnesses initially identify someone other than the defendant. *See United States v. Higgins*, 458 F.2d 461, 465 (3d Cir. 1972). Having considered these criteria, we find that the defendant was not deprived of due process of law by means of the pretrial identification procedures.

A second identification issue involves a pretrial confrontation between two witnesses and the defendant in the absence of the accused's counsel. Approximately three months prior to trial, the defendant was to be arraigned before a United States magistrate on the robbery and abduction charges. In the audience at the arraignment proceeding in the company of an F.B.I. agent were two prospective government witnesses—the hostage and the bank manager. The defendant was unaware of their presence. The agent instructed the witnesses to take a look at everyone in the courtroom in an effort to identify the person responsible for abducting the hostage. A short while later the defendant and at least three other men were led into the courtroom. Within a matter of minutes, both witnesses recognized the defendant as one of the robbers.[9]

■ First, the defendant argues that the confrontation was impermissibly suggestive and that it consequently tainted the subsequent in-court identifications made by these two witnesses. A confrontation, like a photographic display, is an accepted means of identification except where it is "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant is] denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). As a result, the challenged confrontation must be viewed in light of the totality of the circumstances. *Ibid.*

■ Arranging a post-indictment confrontation at the defendant's arraignment[10] for the offense in question is clearly a highly questionable procedure since by that time the accused has been formally charged with a crime and may appear at the proceeding in the custody of law enforcement officers. Even though the two witnesses were told to look at everyone in the courtroom, this instruction was of dubious value since it probably became immediately apparent that only a few persons in the room were criminal defendants. After that realization, a witness could easily conclude that the person to be identified was most likely among those present for arraignment. Because of the dangers of undue suggestiveness, a proper line-up is definitely preferable to an arraignment confrontation. *United States v. Lipowitz*, 407 F.2d 597, 599 (3d Cir.), *cert. denied*, 395 U.S. 946, 89 S.Ct. 2026, 23 L.Ed.2d 466 (1969). The United States seeks to justify its use of this method because the defendant adamantly refused to participate in a line-up. Where a defendant has legal counsel available to him,[11] and he refuses to stand in a line-up, authorities should be able to employ another reasonable means of pretrial identification to help establish the guilt or innocence of the accused. Consequently, the defendant's uncooperativeness is an element to be weighed along with others pertaining to the validity of the confrontation. Viewing the totality of the circumstances, we find that the confrontation was suggestive but not impermissibly so. In light of the fairness exhibited by the participating

9. Prior to this confrontation, the hostage had been unable to pick out the defendant's picture from the photographic spread. That display, although it contained the same group picture of the defendant, was different from the spread challenged on this appeal. On the other hand, the bank manager had tentatively identified Scott on the basis of the challenged array.

10. The witnesses had identified Scott and had left the courtroom before the arraignment proceedings began. *Cf. United States v. Luck*, 447 F.2d 1333 (6th Cir. 1971).

11. At the time of the defendant's refusal, his appointed counsel was not present. However, a substitute attorney was in attendance to represent Scott at this proposed line-up.

federal agent and in view of the positive identifications by the witnesses at the hearing and at trial, we conclude that the defendant was not denied due process by use of arraignment confrontation.

■ Next, the defendant contends that he was deprived of his Sixth Amendment right to counsel at the arraignment confrontation since his attorney was not notified of the attempted identification procedure. This contention presents a substantial issue on appeal.[12] Yet, our review of the record discloses that this issue was raised tangentially and was not thoroughly examined at the hearing concerning the confrontation.[13] Nevertheless, this omission does not require a remand for the taking of additional proof on the point for two alternative reasons. First, if there was an error of constitutional magnitude regarding the absence of counsel, the record indicates that both witnesses could demonstrate an independent basis for their in-court identifications.[14] Secondly, even if no such basis could be established, the admission of their identification testimony would be harmless beyond a reasonable doubt since the three other eyewitnesses did not take part in the confrontation. *Chapman* v. *California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The identification testimony of the hostage and the bank manager was cumulative at best.

■ The defendant's final identification issue is that he was denied due process when he was observed by several government witnesses as he was brought into the courtroom in handcuffs prior to trial. Based upon this Court's recent decision in *United States* v. *Matlock,* 491 F.2d 504 (6th Cir.), *cert. denied,* 419 U.S. 864, 95 S.Ct. 119, 42 L.Ed.2d 100 (1974), we find this argument to be without merit. As in *Matlock,* there was no showing that the government planned or arranged the view. All of the witnesses had identified Scott previously and there was substantial other evidence of his guilt. 491 F.2d at 505–06.

### B. Access to Government Witness

On the opening day of trial, an attorney for one of Scott's co-defendants moved for permission to speak to a government witness whom he had just learned would testify against his client.[15] The United States Attorney opposed this motion.[16] The district judge denied the defense request although he indicated that he would grant a motion for a recess [17] after the witness' direct testimony. The witness in question was Lanaro Green, a former drug addict, who had driven the get-away vehicle. Essentially, Green testified about the events leading up to and immediately after the robbery. He also identified Scott as one of the participants although he did not know the defendant's actual name at the

---

**12.** *See United States* v. *Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert* v. *California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *Stovall* v. *Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

**13.** The government conceded and the court assumed that Scott's appointed counsel was not notified about the arraignment confrontation; the point was not pursued by either side. Therefore, the prosecution was under no burden to explain the circumstances any more completely.

**14.** *See* n. 12, *supra.*

**15.** It is apparent that the attorneys for all the defendants joined in the motion since the testimony of the witness was expected to be inculpatory of each defendant.

**16.** At the trial the United States Attorney argued that the defendants' request was barred by the Jencks Act. 18 U.S.C. § 3500. Because this statute only applies to written statements, this position was abandoned on appeal.

**17.** From the transcript of this discussion, it is not clear for what purpose a motion for recess would have been entertained—whether to give counsel an opportunity to interview the witness or merely to confer with their clients about Lanaro Green's direct testimony. It seems that the court was primarily concerned with giving the defense a chance to meet any surprise testimony. Neither at trial nor on appeal does Scott allege that he was surprised by Green's testimony.

time. The defense did not request a recess and proceeded to cross-examine Green.

■■■■ The defendant asserts that because Green was inaccessible, he was unable to prepare his defense adequately and hence, was denied due process. As a general proposition, a witness is not the exclusive property of either the government or the defendant. *United States* v. *Matlock*, 491 F.2d at 506. A defendant is entitled to have *access* to any prospective witness although such right of access may not lead to an actual interview. "It is true that any defendant has the right to attempt to interview any witnesses he desires. It is also true that any witness has the right to refuse to be interviewed, if he so desires (and is not under or subject to legal process)." *Byrnes* v. *United States*, 327 F.2d 825, 832 (9th Cir.), *cert. denied*, 377 U.S. 970, 84 S.Ct. 1652, 12 L.Ed.2d 739 (1964). Certainly, the prosecution has no right to interfere with or prevent a defendant's access to a witness (absent any overriding interest in security).[18] The importance of the right of access is somewhat tempered by the witness' equally strong right to refuse to say anything. Thus when claiming a denial of due process, a defendant must make a showing of more than just the witness' inaccessibility. Here, the motion was made on the first day of trial. At that time, the United States Attorney had already informed the defendant of the gist of Green's expected testimony; had promised to turn over all statements following direct examination pursuant to the Jencks Act (18 U.S.C. § 3500); and was presumably aware of and had complied with his obligations under *Brady* v. *Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Additionally, the district court indicated that it would grant a recess if the defendants deemed it necessary. Apparently the defendants did not think that a recess was essential since they did not request a recess at the conclusion of the direct examination. *See United States* v. *Keine*, 436 F.2d 850, 855 (10th Cir.), *cert. denied*, 402 U.S. 930, 91 S.Ct. 1531, 28 L.Ed.2d 864 (1971). In view of the above facts, and in the absence of a showing of specific prejudice, we cannot say that the defendant was deprived of his right to a fair trial.

## C. Speedy Trial

The last constitutional argument raised by the defendant is that he was denied his Sixth Amendment right to a speedy trial. Defendant Scott was arrested on or about September 11, 1973, the day of the robbery, after he had been found shot as the result of an undetermined incident. A federal complaint was lodged against him three days later while he was recuperating in a hospital. The defendant remained in the hospital under federal control until November 12, 1973, at which time he was transferred to the county jail. On December 5, 1973, the defendant was indicted, and an initial trial date was set for March 12, 1974. For reasons not entirely clear from the record,[19] trial was not held on that date but rescheduled for May 21, 1974. On March 25, 1974, the defendant unsuccessfully moved to dismiss the indictment for lack of a speedy trial. This motion was renewed on May 22 when the defendant asserted that two of his alibi witnesses could not be located. This mo-

---

**18.** *Gregory* v. *United States*, 125 U.S.App.D.C. 140, 369 F.2d 185, 188 (1966).

**19.** The only explanation that is given in the record is as follows:

THE COURT: May I call to your attention the fact that at the pre-trial before the United States Magistrate Paul Komives on January 10, 1974, there was an Order issued that all motions, if any were to be filed by February 8th and a trial date was then set for March 12th, well within a speedy trial consideration and within Rule 50(b).

For some reason or the other it was adjourned not because of the court, as I recall anyway. It was reset, I don't have the docket sheet—will the Clerk read it?

MR. JACKSON: Your Honor, I am aware of what the Court decided on March 25th. I think that this is new information that has some bearing on this particular motion.

tion was overruled by the district judge, and trial commenced that day.

The defendant complains of the eight month delay from the time of arrest to the start of trial. While we think the length of delay is at least sufficient to trigger an inquiry into the issue, we are convinced that there are other reasons why the speedy trial claim is without merit. *See Trigg* v. *Tennessee,* 507 F.2d 949, 953 (6th Cir. 1974), *cert. denied,* 420 U.S. 938, 95 S.Ct. 1148, 43 L.Ed.2d 414 (1975). A part of the reason for the delay must be attributed to the defendant's own inability to stand trial while he was hospitalized. Concededly, this is a "neutral reason," but it must be considered when assessing the overall delay. *Barker* v. *Wingo,* 407 U.S. 514, 531, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The defendant's two month hospitalization also bears on the element of prejudice since that period should not be weighed in an analysis of "oppressive pretrial incarceration." *Id.* at 532, 92 S.Ct. 2182. It does not appear that Scott's necessary hospital confinement amounts to the type of detention that the speedy trial requirement was designed to avoid. Furthermore, the prejudice claimed in the defendant's last minute motion alleging the loss of two alibi witnesses, is less than compelling since he was able to produce two other alibi witnesses at trial. As a result, we conclude that the defendant has not adequately established the critical factor of prejudice and thus has not proven an abridgement of his right to a speedy trial.

Aside from the constitutional claim of denial of a speedy trial, the defendant asserts that the indictment should have been dismissed as provided for generally in Rule 48(b) of the Federal Rules of Criminal Procedure and Local Rule XXXI of the Eastern District of Michigan. These rules grant to the district judge fundamental supervisory powers over the disposition of criminal cases. In essence, they empower him to dismiss a case because of unnecessary or unreasonable delay even if such delay might not offend the Sixth Amendment. These rules are manifestly addressed to the sound discretion of the trial judge whose decision will not be disturbed on appeal absent a showing of abuse. *Nesbitt* v. *United States,* 249 F.2d 17 (6th Cir. 1957); *cf. United States* v. *LaBorde,* 496 F.2d 965 (6th Cir. 1974). The defendant has failed to demonstrate an abuse of discretion in the present case.

The judgment of the conviction is hereby affirmed.