UNITED STATES of America,
Plaintiff-Appellee,

v.

Louis Phillip AYENDES and James Frazier Noles, Defendants-Appellants.

Nos. 76–1214, 76–1215.

United States Court of Appeals,
Sixth Circuit.

Argued June 24, 1976.

Decided Sept. 1, 1976.

Donald N. Krosin, Cleveland, Ohio, for Ayendes.

Timothy J. Potts, Summers, Potts, Burke & Hildebrand, Cleveland, Ohio (Court-appointed CJA), for Noles.

Frederick M. Coleman, U.S. Atty., John P. Berena, Cleveland, Ohio, for plaintiff-appellee.

Before WEICK, LIVELY and ENGEL, Circuit Judges.

LIVELY, Circuit Judge.

█ On appeal from their convictions for armed bank robbery the appellants contend that photographic arrays shown to eyewitnesses were so unnecessarily and impermissibly suggestive as to require suppression of in-court identifications of the appellants by these witnesses. Each case involving the issue of pretrial photographic identification must be considered on its own facts.

█ A branch of the Second National Bank of Warren, Ohio was robbed by two white men at approximately 2:00 p. m. on January 9, 1975. Though both robbers had made some attempt to disguise their appearance, neither was fully masked. One

of the men, who was carrying a weapon described as a double-barrelled shotgun, stationed himself in the lobby of the bank while the other robber went behind the area of the tellers' cages and took money from several cash drawers. The man in the lobby wore a disguise which consisted of a false nose and dark rimmed glasses and possibly a false mustache. The man behind the counter had on a knit cap described as being like a warmup or ski cap which was pulled down to the level of his eyes so that it was necessary for him to tilt his head backward in order to see ahead. The descriptions of these disguises as given by several witnesses were confirmed by a series of photographs made by a surveillance camera in the bank. There were no immediate arrests and, though they were interviewed shortly after the robbery, none of the eyewitnesses was shown any photographs until after the appellants had been arrested in February 1975.

Early in April 1975 a teller at the bank and one customer who was there at the time of the robbery were shown a spread of six photographs. Another customer was shown the same array in July 1975. Of the six photographs, three were black and white mug shots of white males and three were color snapshots. There was a color photograph of each of the appellants and a group snapshot in color of Ayendes, Noles and a woman later identified as Wilma Buchanan. At a suppression hearing, out of the presence of the jury, these three witnesses recounted similar experiences concerning the photographs. The witnesses were not together when the pictures were shown to them and each saw the photographic spread on only one occasion. All testified that they were merely asked to look at a group of pictures to see if they could identify any of the persons shown by them and that there was no discussion of the bank robbery. Each witness stated that there was no prompting by the FBI agent who showed the pictures. The teller, Darla Neugebauer, testified that she picked two pictures which "looked like" or "resembled" the robbers, but she had no recollection at the hearing in September 1975 of which

pictures she had selected. One of the customers, Cantrell Miller, testified that he had selected the picture of Ayendes as the robber who remained in the bank lobby and had indicated that another picture looked like the other robber. The second customer-witness, Albert Moore, testified that he had picked photographs of two different people from the spread. He also was shown a photograph made by the bank surveillance camera of the robbery in progress.

An FBI agent testified that he showed the same six photographs to all the witnesses and asked them if anyone in the pictures looked familiar as far as their recollection of the robbery was concerned. He stated that the witness Moore identified both Ayendes and Noles; that Miller identified both, but was not positive about Noles; and that Neugebauer selected the pictures of both Ayendes and Noles, but was not positive about either one. Upon questioning by the court the agent testified that he had no conversation with any of the witnesses at the time he displayed the various photographs to them which would indicate that arrests had been made or that the appellants had committed the robbery.

The teller, Darla Neugebauer, further testified at the suppression hearing that she had observed the robber who went behind the tellers' working area for about three or three and one-half minutes and that he came within six inches of her when he took money from her cash drawer. Lighting conditions in the bank were very good. She also testified that she had observed the man who remained in the lobby for about three minutes, and gave estimates of the height of each of the robbers, relating her estimates to known objects. The witness stated that she had a direct frontal view of the robber who took the money from her cash drawer and had both front and side views of the one who remained in the lobby and who was about fifteen feet from her. Miss Neugebauer then made in-court identifications of Ayendes as the man who remained in the lobby and Noles as the man who took the money. She stated positively that her in-court identifications were based on her

recollection of the robbery and not on the photographs which she had seen nearly three months after the robbery and that her memory of the partially disguised robbers was clearer than her memory of the photographs. The witness related the descriptions which she had given to investigators at the time of the robbery and, at the suppression hearing, remembered particularly that Ayendes had dark eyes and that he was a dark complexioned Caucasian. Though there were some inconsistencies in Miss Neugebauer's description of the disguises immediately after the robbery and the disguises as shown in the bank surveillance photographs, the witness repeated on cross-examination that she was sure of her in-court identification and that it was based solely on her memory of the robbery itself.

The witness Cantrell Miller testified that he was seated by the door of the bank through which the robbers entered. He said that the light was very good in the bank and that the man who covered the lobby with a shotgun passed within four or five feet of him. He described the robber in the lobby in great detail, including the fact that he had high cheekbones, a high forehead, thin lips and, extremely white and clean, beautiful teeth. He said that he concentrated on the man in the lobby and had a full five-minute view of him and observed the other robber for about one minute. He stated that he looked right into the face of the man in the lobby from about five feet and that he was within four or five feet of the man who took the money from behind the tellers' area when he left that area. This witness positively identified Ayendes as the man in the lobby and testified that Noles "resembles" the other robber. There were no serious discrepancies between the description of the man in the lobby given by this witness immediately after the robbery and the one which he gave at the hearing. In answer to a question by counsel for Ayendes, Miller said that even though there was no disguise on the photographs which the agent showed him he picked Ayendes because "the side of the face, the eyes, the cheeks, the mouth, it all looked the same." In response to a

question by the court this witness stated that his testimony that Noles looked like the robber who went behind the teller area was based solely on his recollection of the bank robbery and in no way on the pictures which he subsequently saw.

The witness Albert Moore was cashing a check when the robbery took place. He described the man with the shotgun who stayed in the lobby as "dark complected," a Caucasian of possible Spanish extraction wearing a "Groucho Marx" disguise. He was within six feet of the man in the lobby and within four or five feet of the one who went behind the counter. He stated that he could see the mouth, chin and cheeks of the robber in the lobby, who moved back and forth during the holdup and that he got both straight-on and side views of his face. He testified that the man who went behind the counter wore a dark warmup or stocking cap which was pulled down to just cover his eyes. However, the witness said that he could see the eyes, nose, mouth, chin and long hair of the second robber because he wore no mask. He described the lighting as good and said that he had good views of both men for one and a half to two minutes. This witness made positive in-court identifications of both defendants and responded to questions by the court that he was able to do this in spite of the fact that the man in the lobby had on some disguise and the man behind the counter had a knit cap pulled down to his eye level. The witness said his identification was based entirely on what he saw at the bank, and "[t]he photographs have nothing to do with my decision."

The district court denied the motion to suppress, stating that there was no evidence that the FBI agent made any attempt to prompt the identifications and that each of the witnesses had testified that the partial disguises used by the robbers did not make identification impossible. Noting that each witness stated positively that the in-court identification was based on what occurred at the Second National Bank and was not influenced by the photographs, the court found that none of the photographs was unduly suggestive.

One other witness was shown the photographic spread. He was an automobile salesman who had sold a white Ford automobile which was identified as the getaway car. He testified that he spent about 90 minutes with the purchaser of the automobile a few days before the robbery and he identified the appellant Ayendes as the purchaser. The government later showed by the testimony of a fingerprint expert that a print found on the temporary dealer license plate container attached to the white Ford was that of Noles. When it was apparent that the testimony of this witness would be in conflict with other government evidence, the defense withdrew its motion to suppress the testimony of the automobile salesman without conceding that the photographic array was not suggestive.

In *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court defined the standard by which we must test a claim that an in-court identification has been so tainted by a previous photographic identification as to require exclusion. In *Simmons,* after rejecting arguments that a rule should be formulated to prohibit the use of photographs for identification, the Court stated:

> Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Id.* at 384, 88 S.Ct. at 971.

The Court then went on to consider the circumstances surrounding the photographic identification of Simmons as a bank robber and concluded that the likelihood of irreparable misidentification was not sufficiently substantial in that case to require exclusion of the in-court identifications made by five witnesses who had also identified him in photographs. The Court considered the fact that the crime took place in a well-lighted place, that the robbers wore no masks, that the witnesses had opportunities to observe the robbers for up to five minutes, that the photographs were shown to the witnesses the day following the robbery with no prompting by the police, and that none of the witnesses expressed any doubt about their identifications on cross-examination.

This court has had numerous occasions to apply the *Simmons* standard. In *United States v. Russell,* 532 F.2d 1063 (6th Cir. 1976), the court denied suppression of the in-court identification by a bank teller who had a good opportunity to observe a robber and where there was nothing impermissibly suggestive in the way in which the photographic array was shown to the witnesses. However, the identification by another witness who was sitting in an automobile and had a fleeting glimpse of the robber as he ran from the bank was suppressed on a showing that this witness apparently first chose the wrong picture during a display of photographs and only picked the defendant's picture after it had been indicated that the defendant was suspected of robbing the bank. This procedure was held to be so impermissibly suggestive as to lead to a very substantial likelihood of irreparable misidentification.

One of the issues in *United States v. Jennings,* 528 F.2d 222 (6th Cir. 1975), was whether the inclusion of two photographs of Jennings, one in each of two groups shown to witnesses, was impermissibly suggestive. It was argued that the use of two pictures of Jennings would make it more likely that a witness would choose him rather than a person whose picture appeared only once. The court noted the *Simmons* standard and found that the in-court identification testimony of the witnesses was "positive and consistent," that at least one of the witnesses had ample opportunity to observe, over an extended period of time, the robber who wore a hat but no other disguise and that each testified that the in-court identification was in no way affected by the prior photographic identification. Considering all of the circumstances the court concluded that the photographic identification procedure employed in that case

was not so impermissibly suggestive as to require suppression.

A group photograph which emphasized the height and the wide-brimmed hat of one person pictured therein was held to be suggestive in *United States v. Scott,* 518 F.2d 261 (6th Cir. 1975). However, the court concluded, from a consideration of all the circumstances, that "there were several countervailing factors that militated against any substantial likelihood of misidentification." *Id.* at 265.

The photographic array presented to a witness in *United States v. Clark,* 499 F.2d 889 (6th Cir. 1974), *cert. denied,* 420 U.S. 910, 95 S.Ct. 830, 42 L.Ed.2d 840 (1975), was found by this court to be suggestive because the picture of the defendant was larger than the others and the only one which showed a single pose as opposed to a group of mug shots. Even more suggestive was the fact that only the picture of the defendant showed a young man with long hair and a drooping mustache, features which this witness had given in her detailed description of the robber immediately after a holdup. Nevertheless, the court found countervailing circumstances which led it to conclude that the photographic identification procedures were not so impermissibly suggestive as to require suppression of the in-court identification.

We have examined the six photographs which were included in the array shown to the witnesses in the present case along with several photographs of the holdup made by the bank's surveillance camera. It is clear that the procedure of using a display composed of three typical black and white mug shots, a single color picture of each of the defendants with no police information similar to that on the mug shots and a color group photograph in which both of the defendants appeared was suggestive. No necessity was shown for using the color photographs of the appellants. Both Ayendes and Noles had been arrested in Florida several weeks prior to the time when the witnesses were shown photographs and presumably black and white mug shots could have been made available even if the appel-

lants were not present in the Warren, Ohio area for viewing at a lineup. Nevertheless, our consideration of all of the facts disclosed by this record leads to the conclusion that the photographic identification procedures were not so impermissibly suggestive as to render it highly likely that they led to irreparable misidentifications. We note that although counsel stresses the prejudicial effect of showing color photographs of the appellants with black and white mug shots of other white males and the use of a group photograph which repeated the pictures of the defendants, identification witnesses were not cross-examined on these aspects of their previous identifications. We are asked to assume, without any testing of the witnesses' reaction to this issue, that these factors—the color photographs and the group picture—led to misidentification.

Each witness testified in detail concerning the robbery. There is no doubt that the lighting conditions were good, that all witnesses had ample opportunity to observe the men and that the partial disguise of the robber who stayed in the lobby and the cap of the other participant did not prevent these witnesses from seeing the facial features or the general physical characteristics of the robbers. All of the witnesses were positive of their in-court identifications of Ayendes and one witness of his statement that Noles resembled the other robber while both Neugebauer and Moore positively identified Noles as well. All eyewitnesses repeated under cross-examination that their identifications were based solely on their recollections of the bank robbery and were in no way influenced by the single viewing of photographs which each of them had made separately. During the trial before a jury these witnesses again made in-court identifications, with the witness Miller making positive identification of both appellants on this occasion. There is no evidence that any witness received prompting at the time the photographic identifications were made or prior to the in-court identifications. While all the countervailing circumstances discussed in *Simmons, supra,* and *Scott, supra,* are not present the factors

listed above do establish sufficient basis for the conclusion that there was no substantial likelihood of irreparable misidentification in this case.

In *United States v. Russell, supra,* at 1068, this court wrote—

The trial judge has the advantage of personal observation of witnesses. Because the trial judge has this perspective, he has the primary responsibility for applying a standard like the one under consideration here.

In the present case, during the hearing out of the presence of the jury, the trial judge not only observed the witnesses, but he also asked questions which were pertinent to the inquiry. At the conclusion of the hearing he filed a memorandum opinion setting forth the facts which led him to conclude that the photographic identification procedures had not been so impermissibly suggestive as to taint the in-court identifications. District Judge Lambros clearly applied the *Simmons* standard and we conclude that he applied it properly.

■ The appellant Ayendes has raised two other issues which require less discussion. He contends that the district court erred in failing to grant his motion for a separate trial. He argues that there was no evidence to connect him with the automobile which was identified as the getaway car whereas a fingerprint of Noles was found on the envelope in which a temporary license tag for the car was contained. It appears that counsel for Ayendes made a general motion for severance before the trial and before it was clear that there would be direct evidence linking Noles with an automobile described as the getaway car. Counsel did not renew the motion after this evidence was heard and conceded at oral argument that he was contending that the district court should have ordered a severance on its own motion when this evidence was received. It is clear that Ayendes and Noles were properly charged in the same indictment under Rule 8(b), Fed.R.Crim.P. A motion to sever is addressed to the sound discretion of the trial judge and a conviction will not be reversed for denial of such a

motion in the absence of an abuse of discretion. *Opper v. United States,* 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *United States v. Mayes,* 512 F.2d 637, 645 (6th Cir.), *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975); *Glinsey v. Parker,* 491 F.2d 337, 343 (6th Cir.), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2630, 41 L.Ed.2d 227 (1974). We find no abuse of discretion in the failure to sever the trial of Ayendes from that of Noles.

■ The final issue raised by Ayendes relates to his arrest at the Tampa, Florida airport. He maintains that the district court committed error in failing to suppress items which were taken from him in an inventory search immediately following his arrest. The picture of him with Noles and Mrs. Buchanan which was included in the photographic spreads shown to the witnesses was one of the articles so taken. Ayendes was arrested by a special agent of the Florida Department of Criminal Law Enforcement who had in his possession an arrest warrant for Ayendes issued by the Florida Parole and Probation Commission. The agent testified that appellant had violated the terms of his parole by failing to appear at scheduled meetings with his supervisor. This witness stated that he learned officially before he arrested Ayendes that Ayendes had not received permission from his supervisor to leave his assigned area and he received a tip that Ayendes would arrive in Tampa on an airplane which had flown nonstop from Pittsburgh, Pennsylvania. Ayendes attacks the constitutionality of the Florida statute under which the Florida Parole Commission may issue warrants for the arrest of parole violators, but we do not deem it necessary to consider this argument. Though the agent went to the airport with an arrest warrant based on failure to report to his supervisor, he obtained additional information which provided him with probable cause to arrest Ayendes without a warrant for a separate parole violation when he emerged from an airplane which had just landed at Tampa from an out-of-state origin. Even in the absence of a valid arrest

warrant the agent had probable cause to arrest Ayendes as a parole violator. The search was made a short distance from the point of arrest and was limited to the person of Ayendes. The search was reasonable and the district court did not err in denying the motion to suppress evidence seized during a limited search in connection with a legal arrest. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *United States v. Kaye*, 492 F.2d 744 (6th Cir. 1974).

The judgment of the district court is affirmed.