**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Lucky Oshodin IRORERE,**
**Defendant–Appellant.**

No. 01–5423.

United States Court of Appeals,
Sixth Circuit.

June 11, 2003.

Before BOGGS and SILER, Circuit Judges; and STEEH, District Judge.*

STEEH, District Judge.

Defendant was convicted by a jury of one count of aiding and abetting in the possession with intent to distribute approximately 500 grams of heroin, and one count of aiding and abetting the importation into the United States of a substance containing approximately 500 grams of heroin, and was sentenced to 121 months of imprisonment. A woman identified defendant at an investigative pretrial photo lineup as the man named "Prince" she met at the airport who paid for her flight to France, and gave her instructions on contacting a drug supplier in Europe. On appeal, defendant challenges the district court's denial of his motion to suppress the pretrial photo lineup identification, arguing the procedure was impermissibly suggestive, violating his due process rights and warranting reversal of his convictions. Defendant also argues the district court erred by relying upon a prior drug conviction to enhance his sentence. For the reasons set forth below, we **AFFIRM** defendant's convictions and sentence.

## I. Background

Akua Gite lived in Houston, Texas, and had been dating Osazuma Igbinvoia a/k/a Marcus Orji ("Marcus") for about two weeks, when she told Marcus she was looking for a job. Marcus responded that a man in Ohio named "Prince" would pay her $5,000.00 to fly to France and act as a drug courier back to the United States. Marcus paged Prince, who called back and told Gite that he would wire her the money she needed to fly from Houston to Cincinnati. On January 25, 1998, Marcus and Gite went to the "Fiesta Mart" grocery store in Houston, picked up $300.00 from a Western Union Money Transfer, and paid $266.00 for Gite's one-way flight to Cincinnati. Gite was told that Prince would be waiting for her at the Cincinnati Airport.

At the airport, a man Gite presumed to be Prince called out her name. Gite testified that the man fit the description given to her by Marcus: a "light-skinned guy" as compared to "Marcus or a Nigerian who is dark complected...." According to Gite, she and Prince were rushed for time because the flight to Paris was leaving in approximately 45 minutes. Prince handed Gite $100.00 as they walked to an airline ticket-counter. Gite was expecting to receive $500.00 for expenses and shopping, so she asked Prince why he had given her only $100.00. Prince told Gite that the $100.00 was to be used just to get her to Paris, and that she would be taken care of once she arrived. Gite then purchased an airline ticket to Paris with additional money given to her by Prince.

Gite testified that Prince "didn't talk a whole lot," "walked real fast," and kept his conversations "real short." Gite stated that Prince "actually walked ahead of me" and, at times, she had to run to catch up with him. The two walked from the airline ticket-counter to an area near the depar-

---

\* The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

ture gate, and sat down next to each other. In the five minutes before boarding began, Gite attempted to engage in "small talk" with Prince. Prince told Gite that she would meet a man named Charles in Paris. Prince "brushed off" Gite's further questions about Charles, picked up his cell phone, and began a phone conversation. Gite testified that she and Prince were together in the Airport for "roughly 25, maybe 30 minutes." Gite also testified that she met Prince in person only once, at the Cincinnati Airport, and that "I can't really say he really looked me directly in my face."

Upon arriving in Paris, Gite was approached by a man later identified as Charles Otti. Otti and Gite flew together to Amsterdam, Holland, where Gite spent several days. Gite followed Otti's instructions and placed two packages she believed to contain cocaine (later identified as heroin) into a girdle around her waist. Gite spoke with Prince over the phone before leaving Europe, and negotiated a higher courier price of $12,000.00. Prince told Gite that she should take a cab to a Days Inn when she arrived back in Cincinnati, and that she should then page him at a specific pager number.

Gite was stopped by Customs Inspectors at the Cincinnati Airport when she returned to the United States on February 1, 1998. Gite admitted that she was carrying drugs. Gite also told the Inspectors that three men were involved with the drugs: Prince, Marcus, and Charles Otti. Gite described Prince to Customs Inspectors:

> I told them that—I gave them the initial description Marcus gave me, which was that he was kind of tall and he was light-skinned. However, after I met Prince, light skin, he wasn't light-skinned like I'm light, but for a Nigerian, who are typically dark complected, he was light.

He was lighter than an average Nigerian, so I figured that was why Marcus said light.

Gite was taken into custody, and initially transferred to a local hospital for treatment of an insulin deficiency. Gite told Inspectors the pager number given to her by Prince, and she was instructed to page him. Prince returned the page at Gite's hospital phone number. Gite explained to Prince that she had suffered an insulin reaction, and that everything else was fine. Prince told Gite to proceed to the Days Inn location, and to page him once she arrived there. Accompanied by a Customs Inspector, Gite took a cab to the Days Inn and again paged Prince. Prince called back, this time instructing Gite to travel to a bus station in Columbus, Ohio. Gite refused, and Prince failed to appear at the Days Inn. Gite was arrested and later released on bond.

Gite eventually returned to Houston, and was contacted there by DEA Agent Shawn Nguyen. On June 12, 1998, Agent Nguyen asked Gite to look at two photo arrays, each containing eight facial photographs of different men. The first array contained a photograph of Marcus, whom Gite immediately identified. The second array contained a photograph of defendant. Gite testified that she assumed she would also be identifying Marcus in the second array, but that she reacted emotionally when she viewed the second set of photographs:

> A. (by Gite).... [T]ears came to my eyes and I started crying. [Agent Nguyen] asked me why was I upset, and I told him because I didn't think that you all could get him. This is him.

Gite testified she was not hesitant in identifying defendant's picture as Prince.

> A. (by Gite) I told [Agent Nguyen] that I didn't think that you all would find him. I really didn't think they would. I

said, and this is Prince. And he asked me was I sure. And I said, yes, I'm sure.

Agent Nguyen did not confirm to her the identification of defendant as Prince.

The original photo arrays were forwarded to the Cincinnati DEA Office, and were later misplaced. DEA Agent Nguyen had made copies of the arrays, and these copies were used at the district court suppression hearing. Gite, DEA Agent Nguyen, and DEA Agent Jim Lupo of the Cincinnati DEA Office each testified that the copy of the photo array containing defendant's picture depicted defendant in a darker tone than had the original photograph. Of the eight photographs in the second array, only defendant's picture contained a marker in the foreground reading "ID NO." and "DATE." No corresponding identification number or date was depicted.

Defendant and Marcus were indicted on November 10, 1999, on one count of conspiracy to import into the United States and possession with intent to distribute heroin, 21 U.S.C. § 846, one count of aiding and abetting in the possession with intent to distribute heroin, 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2, and one count of aiding and abetting the importation into the United States of a substance containing heroin, 21 U.S.C. § 952, 18 U.S.C. § 2. Defendant moved to dismiss the charges on February 11, 2000, arguing Gite's identification of him in the photo array was impermissibly suggestive and unreliable. The district court construed the motion as a motion to suppress evidence, and referred the motion to a magistrate judge. On June 1, 2000, the district court adopted the magistrate judge's recommendation that the motion to suppress be denied.

The case was reassigned to another district court judge on July 19, 2000. Defendant's co-defendant Marcus pleaded guilty to the conspiracy charge on September 19, 2000. Defendant's jury trial commenced on September 19, 2000. The following day, the jury acquitted defendant on the drug conspiracy charge, and convicted him on the remaining two counts of aiding and abetting in the possession with intent to distribute 500 grams or more of heroin, and aiding and abetting the importation of 500 grams or more of heroin into the United States. The Presentence Investigation Report ("PSIR") reflected a computed Base Offense Level of "32," a figure arrived at by adding the 600 grams of heroin involved in defendant's prior federal drug conviction in Chicago, Illinois, as "relevant conduct" under United States Sentencing Guideline ("U.S.S.G.") § 1B1.3, application note 9(B), to the 504.1 grams of heroin involved here. Based on a computed Total Offense Level of "32," and a criminal history category "I," the PSIR indicated a sentencing guideline range of 121 to 151 months. Defendant was sentenced on March 27, 2001, to 121 months of imprisonment.

## II. Admission of Pretrial Photo Lineup Identification

This court reviews a district court's factual findings on a motion to suppress for clear error, and its legal conclusions *de novo.* *United States v. Crozier,* 259 F.3d 503, 510 (6th Cir.2001), *cert. denied,* 543 U.S. 1149, 122 S.Ct. 1111, 151 L.Ed.2d 1005 (2002). "Due process 'prohibits the use of identifications which under the totality of the circumstances are impermissibly suggestive and present an unacceptable risk of irreparable misidentification.'" *Id.* (quoting *Carter v. Bell,* 218 F.3d 581, 605 (6th Cir.2000)). "A conviction based on identification testimony that follows a pretrial identification violates the defendant's constitutional right to due process whenever the pretrial identification procedure is so 'impermissibly suggestive as to

give rise to a very substantial likelihood of irreparable misidentification.'" *Ledbetter v. Edwards,* 35 F.3d 1062, 1070 (6th Cir. 1994) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), as quoted in *Thigpen v. Cory,* 804 F.2d 893, 895 (6th Cir.1986)).

A two-part test is employed in assessing the validity of a pretrial identification. *Ledbetter,* 35 F.3d at 1070. First, the court considers whether the procedure was unduly suggestive. *Id.* at 1070–71 (citing *Thigpen,* 804 F.2d at 895). The defendant bears this burden of proof. *Id.* at 1071 (citing *United States v. Hill,* 967 F.2d 226, 230 (6th Cir.1992)). If the procedure is determined to be unduly suggestive, the court proceeds to the second step to determine if the pretrial identification was nonetheless reliable under the totality of the circumstances. *Crozier,* 259 F.3d at 510 (citing *Ledbetter,* 35 F.3d at 1070).

### A. Unduly Suggestive Test

The magistrate judge compared the eight photos in the copy of the second array that contained defendant's picture:

> The photographic array depicts eight African American males. Every one has a receding hairline, very short hair, or a shaved bald head. Every one has a prominent forehead and ears. Every one has closely cropped facial hair. Every one has a broad nose. Every one is facing directly into the camera with a grim, unsmiling countenance. Every one is depicted from the shoulders up only. No one is against a background that would indicate his height. While one photograph depicts a man who may be of a larger build, all the others appear to be of medium build. Two of the eight sport one earring, while the other

six do not. Seven of the photographs have a yellowish cast to them, while the photograph of Defendant Irorere has an overall darker, grayish hue. In five of the photographs, the very top of the person's head is cut off; in two the entire head is depicted, but at the very top of the photograph; and, in the photograph of Defendant Irorere, approximately one-half inch of space appears between the top of his head and the top of the photograph. Only in the photograph of Defendant Irorere is a marker apparent in the foreground, which has blank spots where an "ID No." and "Date" could be, but were not, inserted. All of the photographs are of approximately the same size.

Defendant argues that Gite was unduly "steered" to his picture by the photo's considerably darker tone, and its exclusive depiction of a "mug shot" marker reading "ID No." and "Date."[1]

At the outset, defendant is correct to the extent he argues the Sixth Circuit has condemned the practice of showing "mug shot" evidence to a jury "as effectively eliminating the presumption of innocence and replacing it with an unmistakable badge of criminality." *Eberhardt v. Bordenkircher,* 605 F.2d 275, 280 (6th Cir. 1979) (reasoning in habeas review that showing "mug shot" evidence to the jury was one of several trial errors having a cumulative prejudicial effect that precluded a finding of harmless error). *But see Murray v. Superintendent, Kentucky State Penitentiary,* 651 F.2d 451, 454 (6th Cir.1981) (reasoning in habeas review that showing "mug shot" evidence to jury was not prejudicial where jury was already fully informed that the defendant had a crim-

---

1. The Government filed a Notice of Filing of Photographic Arrays with the district court on June 5, 2000, providing notice that the original arrays were found and filed with the district court.

inal record). This Circuit has also held that including one color photograph of a criminal defendant among a group of black-and-white photographs is unduly suggestive. *See Crozier,* 259 F.3d at 510 (citing *United States v. Ayendes,* 541 F.2d 601, 605 (6th Cir.1976) (finding that use of a single color picture of each defendant with no police information as depicted in the remaining black-and-white "mug shots" was suggestive, but "not so impermissibly suggestive as to render it highly likely that they led to irreparable misidentifications"), and *O'Brien v. Wainwright,* 738 F.2d 1139, 1140 (11th Cir.1984) (holding that use of defendant's color photo among five other black-and-white "mug shots" was impermissibly suggestive)). A defendant's photograph that is the only one lacking "mug shot" lines in the background, however, has been held not to be unduly suggestive. *United States v. Perry,* 991 F.2d 304, 311 (6th Cir.1993) (citing *Cikora v. Dugger,* 840 F.2d 893, 896 (11th Cir.1988) (reasoning that height markings in defendant's photograph were not unduly suggestive because it was doubtful "that anyone viewing the array would not realize that at least three, and possibly all, of the other five photographs were also 'mug shots' ")). Standing alone, minor differences in the exposure and quality of photographs in a pretrial lineup array do not establish that the array was impermissibly suggestive. *See United States v. L'Allier,* 838 F.2d 234, 240 (7th Cir.1988).

██ In the case at bar, defendant has not met his burden of proving that the use of his darker-toned photograph in a photo array, exclusively depicting a "mug shot" marker, rendered the overall pretrial identification procedure used by DEA Agent Nguyen unduly suggestive. *Ledbetter,* 35 F.3d at 1071. Beyond using the challenged photograph, DEA Agent Nguyen

did not say or do anything that would have suggested to Gite that she should identify defendant's photograph as a photograph of Prince. Agent Nguyen did not confirm Gite's identification of defendant as Prince. Gite testified that the original photograph of defendant that she was shown in Houston was not "noticeably" darker than the other seven photographs, in contrast to the copy of photographs she was shown at the suppression hearing.[2] The magistrate judge's assessment that Gite's testimony was credible is entitled to deference. *See United States v. Hill,* 195 F.3d 258, 264–65 (6th Cir.1999). Further, even the "overall darker, grayish hue" of the copy of defendant's photograph, as described by the magistrate judge, represents only a minor overall difference as compared to the "yellowish cast" of the other seven photographs. This is not a case involving the stark contrast between color photographs and black-and-white photographs.

The undue prejudice arising from placing a "mug shot" before a jury in a criminal trial is not fully analogous to the use of "mug shots" in pretrial identification lineups. Accepting without deciding that the "mug shot" marker depicted in defendant's photograph raised the "unmistakable badge of criminality," *Eberhardt,* 605 F.2d at 280, nothing in the record indicates that Gite knew whether or not Prince had a prior criminal record, or had ever been arrested. The implied inference that Gite would identify someone depicted in a "mug shot" as being Prince is weak, although Agent Nguyen admitted that DEA procedures for using photographic lineups require identifying markings in "mug shots" to be covered up. DEA Agent Nguyen's use of defendant's somewhat darker photograph depicting a "mug shot" marker was suggestive, but not so impermissibly sug-

**2.** The court reviewed the copy of the original    filed with the Sixth Circuit.

gestive under the totality of the circumstances, as to present an unacceptable risk of irreparable misidentification. *Crozier,* 259 F.3d at 510.

### B. Reliability Test

The court must consider five factors in assessing the reliability of the pretrial identification: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of the observation; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty of the witness when confronted by the criminal; and (5) the length of time between the crime and confrontation. *Ledbetter,* 35 F.3d at 1071 (citing *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), and *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). Weighing these five factors, Gite's pretrial photo array identification of defendant as Prince was reliable notwithstanding the darker tone of the photograph and exclusive depiction of a "mug shot" marker.

Gite had the opportunity to view Prince at the Cincinnati Airport for twenty-five to thirty minutes. *See Crozier,* 259 F.3d at 511 (finding viewing criminal in well-lit building for ten minutes weighed in favor of reliability). During that time, Gite and Prince conversed about Gite's receipt of only $100.00 to fly to Paris, Gite's purchase of the airline ticket, the name of Gite's contact in Paris, and the procedure by which Gite would be contacted overseas. Gite and Prince sat together for roughly five minutes before Gite boarded her flight. Gite's testimony that Prince at times walked ahead of her, kept his conversations short, and may not have "really looked [at her] directly in the face," does not significantly diminish the considerable

thirty minute opportunity Gite had to view Prince at the Cincinnati Airport.

Gite was attentive during the time she spent with Prince at the Airport. Gite testified that Prince fit Marcus' description. Gite had to be attentive to Prince in order to receive the money and instructions needed to accomplish the criminal task. If anything, rushing to catch the flight made Gite more attentive, as time could not be wasted on repeated instructions. Gite was not under the *See Crozier,* 259 F.3d at 512 (citing *United States v. Hill,* 967 F.2d 226, 233 (6th Cir.1992) for the proposition that a five-year time lapse does not operate to bar an otherwise reliable identification); *United States v. Causey,* 834 F.2d 1277, 1285 (6th Cir.1987) (holding three- to four-month delay does not render identification inherently unreliable, citing *United States v. Marchand,* 564 F.2d 983 (2d Cir.1977) (nine-month delay upheld)); *United States ex rel. Clark v. Fike,* 538 F.2d 750 (7th Cir.1976) (five-month delay upheld).

"An identification is admissible if reliable, even if obtained through suggestive means." *Crozier,* 259 F.3d at 510 (citing *Biggers,* 409 U.S. at 196–97). To the extent defendant's photograph was suggestive, Gite's identification of defendant as Prince was independently reliable under the totality of the circumstances.

### III. Sentencing Enhancement Based on Related Offense

This court reviews a district court's factual findings underlying a sentencing decision under a "clearly erroneous" standard, giving due deference to the district court's application of the sentencing guidelines to the facts. *United States v. Hill,* 79 F.3d 1477, 1481 (6th Cir.1996) (citing *United States v. Hamilton,* 929 F.2d 1126, 1130 (6th Cir.1991), and quoting 18 U.S.C. § 3742(e)). However, "[w]hether the facts

found by the district court warrant the application of a particular guideline provision is a legal question and is to be reviewed *de novo* by the appellate court." *Id.* (quoting *United States v. Partington,* 21 F.3d 714, 717 (6th Cir.1994)). A determination that another drug transaction should be counted as "relevant conduct" for purposes of sentencing under U.S.S.G. § 1B1.3(a)(2) is thus reviewed *de novo.* *Id.*

Defendant initially argued that the district court erred in sentencing him to a mandatory minimum 10–year sentence under 21 U.S.C. § 841(b)(1)(B) and 21 U.S.C. § 960(b)(2)(A) because he committed the instant offense on February 1, 1998, but his federal drug conviction in Chicago, Illinois did not become final until it was affirmed on September 26, 2000 in *United States v. Irorere,* 228 F.3d 816 (7th Cir. 2000). Defendant therefore maintained that his September 26, 2000 conviction could not be considered a "prior" conviction under § 841(b)(1)(B). Defendant was not sentenced to a mandatory 10–year minimum sentence under § 841(b)(1)(B) or § 960(b)(2)(A), and thus his initial argument is misplaced.

Rather, defendant's sentence was enhanced pursuant to U.S.S.G. § 1B1.3 and the criminal conduct underlying the Chicago drug conviction. Under U.S.S.G. § 1B1.3(a)(2), and U.S.S.G. § 1B1.3, application note 9(B), the base offense level where the guideline specifies more than one base offense level shall be determined on a basis that accounts for other offenses constituting the "same course of conduct."

9. "Common scheme or plan" and "same course of conduct" are two closely related concepts.

(B) Same course of conduct. Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity. The nature of the offenses may also be a relevant consideration (e.g., a defendant's failure to file tax returns in three consecutive years appropriately would be considered as part of the same course of conduct because such returns are only required at yearly intervals).

U.S.S.G. § 1B1.3, application note 9(B).

Defendant's Seventh Circuit drug conviction was based upon two shipments of heroin from Thailand to undercover addresses in Chicago: 289.9 grams on January 22, 1998, and 310.7 grams on March 24, 1998. *Irorere,* 228 F.3d at 821. Defendant contacted an undercover DEA agent shortly after the shipments had arrived from Thailand. *Id.* A drug contact named Chiawan traveled to Chicago to collect payment, believing DEA agents were part of the drug operation. *Id.* After a few meetings between defendant and Chiawan were canceled, defendant met undercover DEA agents in Chiawan's hotel room on April 1, 1998. *Id.* Defendant told the agents he was unprepared to make payment that day, but would be prepared to pay the next time. *Id.* The DEA agents

decided to proceed with the transaction, and delivered a package of heroin to defendant. *Id.* Defendant was arrested when he took possession of the package, and was eventually convicted of conspiring to import heroin into the United States, 21 U.S.C. §§ 952(a), 963, and 18 U.S.C. § 2, and importing heroin into the United States, 21 U.S.C. §§ 952(a) and 18 U.S.C. § 2. *Id.* at 821–22.

The instant offenses of aiding and abetting in the possession of approximately 500 grams of heroin with intent to distribute, and aiding and abetting the importation of approximately 500 grams of heroin into the United States, are very similar to the 600–gram heroin conspiracy and importation offenses for which defendant was convicted in Chicago. The instant importation offense was completed on February 1, 1998 with Gite's arrival in Cincinnati. The Chicago 289.9–gram heroin importation offense was completed on January 22, 1998, three days before Gite flew to Paris as a drug courier on defendant's instructions. The Chicago 310.7–gram heroin importation offense was completed on March 24, 1998, just three weeks after Gite had returned from Europe carrying 504.1 grams of heroin on defendant's behalf. The offenses share a common purpose—importing a total of 500 grams or more of heroin into the United States during a two-month period. *See Hill,* 79 F.3d at 1483 (recognizing that factors such as common victims, common purpose, common offenders, or similar modus operandi may be used to bolster a finding that a prior offense was part of the "same course of conduct" as the offense of conviction.). The Chicago importation offense was completed prior to the instant importation offense. The two offenses are simply not, as defendant argues, isolated offenses. Weighing the factors of the degree of similarity of the offenses, repetition of the heroin importing offense, and the lack of a significant time interval be-

tween the offenses, this court concludes that defendant's sentence was properly enhanced under the "same course of conduct" provision of U.S.S.G. § 1B1.3, application note 9(B).

## IV. Supplemental Brief

Defendant filed a *pro se* supplemental brief on February 25, 2002 arguing that his co-defendant Marcus told the Government that defendant wired him $300.00 on January 25, 1998 for "personal use," and therefore Gite's testimony to the contrary constituted perjury. Defendant's argument that the Government knowingly used this "perjured" testimony to gain his conviction is frivolous.

## V. Conclusion

For the foregoing reasons, defendant's conviction and sentence are **AFFIRMED.**