IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 80802-8-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| JOSEPH ANDRE COBBS, | |
| Appellant. | |

COBURN, J. — A jury convicted Joseph Andre Cobbs of the crime of harassment while on community custody. Cobbs appeals arguing the trial court's grant of the prosecutor's peremptory challenge to excuse a potential juror of color violated General Rule (GR) 37 and the Fourteenth Amendment to the United States Constitution. Cobbs also argues the trial court abused its discretion in denying his motion for mistrial because the State's key witness made eye contact with Cobbs while officers escorted him in shackles prior to making an in-court identification. Because the peremptory challenge was proper and the in-court identification was not impermissibly suggestive, we affirm.

FACTS

From November to March, the Salvation Army in Everett operates a cold weather shelter. Upon arrival, every shelter guest is supposed to "check in" with the shelter staff, and the staff complete a check-in card with the guest's name.

Citations and pin cites are based on the Westlaw online version of the cited material.

The shelter contains a lobby where guests can sleep, a storage closet where guests can obtain fresh clothing, and a chapel where guests can pray.

At 4 a.m. on February 15, 2019, Brianna Injinmej started her shift at the shelter. That morning, Injinmej was responsible for watching the shelter guests sleeping in the lobby and for providing the guests with clothes.

Ryan Smith approached Injinmej with an individual Injinmej did not know, who was later identified as Cobbs. Injinmej was familiar with Smith because "[h]e stayed in the shelter a few times," and "he stayed in a motel program we were running." Smith and Cobbs asked Injinmej for clothes, and Injinmej led them to the small but well-lit storage closet. Injinmej spent approximately 30 minutes in the closet with Smith and Cobbs while they looked through clothes. Because the closet was small, Injinmej, Smith, and Cobbs "were pretty close" and "[w]ithin arm's distance" of each other. Injinmej gave Smith and Cobbs each a pair of pants. Cobbs put black "Dickies" pants over the sweatpants he was wearing.

Later, Smith and Cobbs reapproached Injinmej and asked if they could pray in the chapel, and she let them into the chapel. According to Injinmej, when she heard the men talking, she went into the chapel to see if they had finished praying. Smith and Cobbs asked Injinmej where they could find the building's exits, which Injinmej then pointed out. Injinmej recalled thinking Cobbs "seemed pretty paranoid" because he said there were "people out to get him." Smith closed the chapel door and then Cobbs told Injinmej that he needed to get out. Injinmej again pointed to the exits and said, " 'you can leave whichever way you want.' " Injinmej testified that, even though the chapel was dark, Cobbs "said he

2

had a gun, and then he pulled out what I assumed was a gun." Injinmej started walking towards the nearest exit. Then, Cobbs "said he needed to get out safely," and "[h]e was willing to take out everyone . . . even if the police showed up." Injinmej interpreted Cobbs's statements to mean he was "willing to take everyone out, that he would shoot people."

Although Injinmej was scared for her safety, she walked Cobbs to the chapel exit, through a dark hallway, and through the building's emergency exit doors to outside. Injinmej testified that because it was dark outside, she could not see what Cobbs held in his hands but she thought it looked like a handgun. Injinmej unlocked the gate to the building, and Smith and Cobbs "ran out of the gate and down the alley to the left."

Injinmej then went back inside to tell her coworker what had happened, and her coworker called 911. Injinmej identified Smith and provided the police with a written statement describing the event and Cobbs's physical appearance. "Injinmej described the male suspect as about 5'08", medium build, wearing a black beanie cap, grey pea coat, with a balding, but shaved head. She indicated he appeared clean and well groomed." Then, Injinmej went home.

At 10:25 a.m. that same morning, Marysville Police Officer Wade Rediger responded to a dispatch and observed two men in a Fred Meyer parking lot. Rediger identified the men as Smith and Cobbs. Rediger testified to Cobbs being bald, wearing a red flannel shirt, and being about 5'8" or 5'9".

That afternoon, because Injinmej had identified Smith, Everett Police Officer Oleg Kravchun ran Smith's criminal history and found that Rediger

3

recently made contact with Smith and Cobbs in Marysville. Everett Police Officer Anatoliy Kravchun informed Officer Ryan Terpening who compiled a photomontage including a photograph of Cobbs.

Between four and six hours after the incident at the shelter, Injinmej returned to the shelter to meet with the officers. The officers showed Injinmej the photomontage, and Injinmej "immediately" identified the photograph of Cobbs as the man with the gun.

The State charged Cobbs with the crime of harassment while on community custody. RCW 9A.46.020(1) and (2)(b)(ii).

At trial, during voir dire, the prosecutor asked, "Does anyone here think they wouldn't be a good juror?" Juror number nine answered, "I think I'm impressionable. It's sometimes hard to separate what is the facts or, I guess, what could be logically thought out versus, like, spending hours and hours listening to people who could sway your judgment through their words or, I guess, tactics. So I just wouldn't trust myself." The prosecutor followed up by explaining, "[A] big part of being a juror is having to make decisions and being confident in your decisions and being confident beyond a reasonable doubt in your decisions." The prosecutor then asked juror number nine, "So do you think you would have a hard time with that aspect?" Juror number nine responded, "Yeah."

The prosecutor then asked if there were other jurors who felt similar to juror number nine. It appears that when no one responded, the prosecutor asked juror number 10 if they shared juror number nine's feelings. Juror number 10

4

said, "I feel kind of slightly the same," and "I feel like if it . . . would be my fault if that person was, like, found guilty for something that they really didn't do . . . It's just there's always that doubt in my mind, I guess. What if? What if they weren't?" The prosecutor then asked juror number 10, "if the State produced testimony and evidence beyond a reasonable doubt, would it still be difficult for you to render a verdict of guilty because of that concern you have?" Juror number 10 said, "I said I'm not 100 percent sure. I think maybe I would be more sure, like, doing more eyewitness or evidence or anything else. I think I would — that would help me make a decision." Then the trial court told the prosecutor that she was out of time, and the prosecutor stopped her questioning.

The prosecutor exercised a peremptory challenge to strike juror number nine, who immediately stood up to apparently exit before the trial judge asked him to sit down. The trial judge needed to return to inquiries with another juror who was visibly emotional. While excusing that juror for cause, and in the midst of seating the replacement juror, juror number nine again stood up causing the trial court to ask him to take a seat noting, "I know you're eager to get away from me." After confirming the parties did not have any more challenges for cause, the trial court returned to juror number nine stating, "Juror number 9, you can make your dash for the door now." Citing GR 37, defense counsel objected to the prosecutor's challenge, and the trial court asked juror number nine to return to his seat. Then, the trial court directed all the prospective jurors, including juror number nine, to go to the jury assembly room so the parties could discuss the GR 37 objection outside the jury's presence.

5

Defense counsel identified juror number nine as a person of color. The prosecutor agreed that juror number nine was "clearly of a racial class that's available for the GR 37 objection." The prosecutor explained that it exercised its peremptory challenge to strike juror number nine because that juror "provided his own race-neutral basis for why he would not make a good juror." The prosecutor further explained:

> He specifically indicated that decision-making and coming to a conclusion would be a difficult task for him and that he was easily swayed by the impressions and thoughts of others. Part of a juror is holding onto your beliefs and not changing your beliefs simply because of the other members of the jury pool. [. . .]

> And juror number 9 admitted on his own accord that was an obligation as a juror that he would have difficulty fulfilling. I think that his answers are actually different than juror number 10 who expressed a similar concern, but she expressed merely that she thought it might be difficult for her; whereas juror number 9 was more resolved in the fact that that was not something that he was comfortable doing.

The prosecutor argued, "given that juror number 9 is the one that expressed his own concern for his ability to remain impartial and to maintain his decision in light of other juror members, I think that is a race-neutral reason, and it is a basis for proper peremptory strike by the State."

Citing GR 37(g)(i),[1] defense counsel asked the trial court to consider the number and types of questions the prosecutor asked juror number nine compared to those she asked juror number 10. Specifically, defense counsel

---

[1] "In making its determination, the circumstances the court should consider include, but are not limited to," "the number and types of Questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to Question the prospective juror about the alleged concern or the types of Questions asked about it." GR 37(g)(i).

argued the prosecutor asked juror number nine questions it did not ask other prospective jurors, and it asked juror number 10 follow-up questions that it did not ask juror number nine. Defense counsel also argued the prosecutor's reason for challenging juror number nine—his indecisiveness and impressionability— was similar to challenging a juror for "exhibit[ing] a problematic attitude," which is included in GR 37(i)'s list of historical reasons associated with improper discrimination in jury selection.

The trial court reviewed the voir dire transcript and decided to bring juror number nine back into the courtroom for further questioning on the record because the prosecutor asked juror number 10 further clarifying questions that it had not asked juror number nine. GR 37(g)(i).

When juror number nine returned to the courtroom, the trial court allowed both parties to inquire further.

> Prosecutor: Earlier you mentioned it is difficult for you to make a decision and that you're easily swayed and influenced by others. Is that fair? Kind of what you said?
>
> Juror number nine: Sure. I'll say yes.
>
> Prosecutor: Okay.
>
> Juror number nine: I think it's just case-by-case basis. I wouldn't say, like, any situation I'm just easily swayed. I'm aware there's always psychological pitfalls as someone can, you know, have. So it's — that's what factors into general ability — disability to feel confident on decisions or feel indecisive in general, and that's just I think how I think on things.
>
> Prosecutor: If the State were to present evidence to you beyond a reasonable doubt, would you be able to render a verdict of guilty?

Juror number nine: Like, I would say it depends, because I'm not sure what it means to have something beyond a reasonable doubt. I just don't know what that means.

Prosecutor: Okay. And if the Court gave you instructions as to what that means, do you think you would be able — and the State provided evidence through testimony and exhibits beyond a reasonable doubt, do you think you would be able to come to a decision? I'm just asking honestly.

Juror number nine: Yeah. So going off of the Court's — so you're going off of the Court's definition of what's beyond a reasonable doubt, I would be either able to say yes or no? I want to say yes, but I'm not sure if there's — there's always, like, little holes that can be poked through anything, I believe.

Prosecutor: Okay. And if you were reviewing the evidence and you had a decision in your mind beyond a reasonable doubt and you went back and you were deliberating with the jurors, would you be able to stand by your decision and not change your mind just based on what other people are telling you?

Juror number nine: I think that's, again, where it would be hard for me to come to a decision or to even maybe stand up or feel like I can make a — or be in that group situation, just because I know, like, the group thing can happen, and I can easily be swayed by that, especially if there's a long deliberation or there's any strong personalities in the group. In those cases, I just don't know what I would do.

Defense counsel then inquired and confirmed that juror number nine is a student studying marketing and asked if the juror was able to make decisions in school.

Juror number nine: Yeah, of course. I can make decisions. I think not just in a courtroom setting. It's just — I don't think it's my place. Or I don't know if I trust myself enough to know the law or know — even, like, the definition of what's beyond a reasonable doubt, what's the definition of logical thinking. It's just stuff that for me, I can never feel certain.

Defense counsel: Well, the judge is going to provide you with a definition of reasonable doubt, and I think I can tell you without misstating the law that it is not — you can have some doubt. It's not

8

an absence of doubt. It's beyond a reasonable doubt. And you will get written language on how — what that means.

So I guess my question is, as much as [the prosecutor] asked, if you're back there and there's some people who think, well, the State proved their case and you are not sure, can you stand — can you sit there and stand there and say, "No, I am not changing my position. I don't think the State proved its case"?

Because it's one thing not to be able to decide, but it's another thing to realize you haven't been given enough information to make a decision.

Juror number nine: Right. In that case, I feel most times I would be able to say yes, but what would be hard for me is knowing if there might be evidence or something totally outside the box or circle, whatever you want to call it, that might come up later on or that might have been just, I don't know, misrepresented in any way.

But I think if I'm going off of paper and it's, like, very, very literal and it's — it' very clear-cut, I can — I can go off of that.

[. . .]

Defense counsel: I just don't want you to think that the test here is convinced beyond a reasonable doubt of his guilt. And if the answer is no, then it's incumbent on you to say not guilty. Can you do that?

Juror number nine: I think I'd say I can handle it. I can do that.

After further argument from the parties outside the presence of juror number nine, the prosecutor renewed her peremptory challenge. The trial court conducted its GR 37 analysis on the record and granted the prosecutor's peremptory challenge over defense counsel's objection.

The day before she testified, Injinmej told the prosecutor that she was unsure if she would be able to identify Cobbs at trial. During trial, Injinmej testified she was confident in her identification of Cobbs's photograph from the photomontage "[b]ecause I knew . . . that's the person I spent that morning with." In court, Injinmej also identified Cobbs as the individual holding the gun in the chapel. She said she recognized his face.

9

After Injinmej testified, defense counsel learned from Cobbs that Injinmej saw Cobbs in the hallway outside the courtroom the day before she testified and identified Cobbs in court. Concerned that Injinmej may have seen Cobbs in shackles and escorted in the hallway by corrections staff, defense counsel moved for a mistrial. Defense counsel argued viewing Cobbs was impermissibly suggestive and tainted Injinmej's in-court identification. In the alternative, defense counsel asked the trial court to strike the in-court identification from the record or to provide a curative jury instruction.

The State's victim advocate contacted Injinmej who confirmed she saw Cobbs in the hallway outside the courtroom. According to the prosecutor, Injinmej "made quick eye contact but looked away because she was nervous, and she indicated that she did not know whether he was handcuffed or in custody."

The prosecutor argued that Injinmej's viewing of Cobbs in the hallway did not rise to the level of a due process violation because "the record has sufficient basis for Ms. Injinmej's in-court identification outside of seeing him in the hallway." To support this argument, the prosecutor raised "the fact that she positively identified him previously through photographic montage."

The trial court considered that Injinmej spent 30 minutes with Cobbs in the shelter's well-lit storage closet and the partially-lit chapel, that Injinmej previously gave officers a description of Cobbs, and that Injinmej previously identified Cobbs from the photomontage. All of these identifications occurred months before trial. The trial court also considered the facts in State v. Birch, 151 Wn.

App. 504, 213 P.3d 63 (2009) where it was not per se impermissibly suggestive when the witness viewed the defendant in shackles before making an in-court identification. The prosecutor argued, and the trial court agreed, Birch is controlling. The trial court found Cobbs failed to show the identification was impermissibly suggestive, denied Cobbs's motion for mistrial, and denied his request for a curative instruction.

The jury found Cobbs guilty of the crime of harassment while on community custody.

Cobbs appeals.[2]

## DISCUSSION

## Peremptory Challenge

Cobbs argues the trial court violated GR 37 and deprived him of his Fourteenth Amendment rights to due process and equal protection when it permitted the State to exercise its peremptory challenge to strike juror number nine.

During jury selection in a criminal trial, the parties can use peremptory challenges to remove prospective jurors without cause. Flowers v. Mississippi, 139 S. Ct. 2228, 2238, 204 L. Ed. 2d 638 (2019). In other words, parties could use a peremptory challenge to strike "any potential juror for any reason—no questions asked." Id. However, history has shown that prosecutors have used

---

[2] The State filed a notice of cross-appeal. However, the State did not assign errors in its response brief, and asks this court to affirm Cobbs's conviction. We "only review a claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto." See RAP 10.3(g).

peremptory challenges to exclude all jurors of color, especially in cases involving defendants of color. Id. at 2238-41; State v. Jefferson, 192 Wn.2d 225, 240-41, 429 P.3d 467 (2018).

In Batson v. Kentucky, the Supreme Court of the United States recognized that purposeful race discrimination in the use of peremptory challenges violates the Fourteenth Amendment's equal protection clause because it denies defendants their right to a jury of their peers. 476 U.S. 79, 86-89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). It also recognized the harm from this discrimination extends beyond the defendant because it denies prospective jurors the right to participate and exercise their civic duty and it undermines public confidence in the fairness of the criminal justice system. Id. at 87-88. Accordingly, the "State may not discriminate on the basis of race when exercising peremptory challenges against prospective jurors in a criminal trial." Flowers, 139 S. Ct. at 2234 (citing Batson, 476 U.S. 79).

The Batson Court established a three-part test for determining whether a prosecutor's exercise of a preemptory challenge to exclude a juror from a cognizable racial group violated the defendant's right to equal protection. 476 U.S. at 90. Originally, under the Batson test, first the defendant must make a "prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Id. at 93-94. Since its creation, the Court expanded the Batson framework to better guard against discrimination. Flowers, 139 S. Ct. at 2243. Today, "[a] defendant of any race may raise a *Batson* claim, and a defendant may raise a Batson claim even if

12

the defendant and the excluded juror are of different races."[3]  Id.  "[A] single instance of race discrimination against a prospective juror is impermissible."  Id. at 2242.  Second, if the defendant makes a prima facie showing of purposeful discrimination, the burden shifts to the State to provide an "adequate, race-neutral justification for the [peremptory] strike."  City of Seattle v. Erickson, 188 Wn.2d 721, 726-27, 398 P.3d 1124 (2017) (citing Batson, 476 U.S. at 94).  Third, if the prosecutor provides a race-neutral explanation, the trial court must weigh all the relevant circumstances to decide if the prosecutor's reasons were pretextual and give rise to an inference of discriminatory intent.  Batson, 476 U.S. at 97-98; Snyder v. Louisiana, 552 U.S. 472, 485, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008).

Our Supreme Court considered the long history of race discrimination in jury selection and found that our application of the Batson analysis did not eliminate the problem.  Jefferson, 192 Wn.2d at 240-41.  Our Supreme Court revisited the Batson framework in an effort to better guard against discrimination. In 2017, our Supreme Court amended its Batson framework by holding "that the peremptory strike of a juror who is the only member of a cognizable racial group constitutes a prima facie showing of racial discrimination requiring a full *Batson* analysis by the trial court."  Erickson, 188 Wn.2d at 724.  Despite this "fix," our Supreme Court continued to recognize deficiencies in the Batson analysis: "(1) *Batson* makes 'it very difficult for defendants to prove [purposeful]

---

[3] Batson also now applies to gender discrimination.  Flowers, 139 S. Ct. at 2243.

13

discrimination even where it almost certainly exists' and (2) *Batson* fails to address peremptory strikes due to implicit or unconscious bias, as opposed to purposeful race discrimination." Jefferson, 192 Wn.2d at 242. In an effort to address the exclusion of potential jurors due to implicit or unconscious bias, in addition to explicit racial bias, in 2018, our Supreme Court adopted GR 37. Id. at 241-44.

Under GR 37, a party may object or the court may raise an objection "to the use of a peremptory challenge to raise the issue of improper bias." GR 37(c). After a party or the court raises a GR 37 objection, "the party exercising the peremptory challenge shall articulate the reasons that the peremptory challenge has been exercised." GR 37(d). Where the third part of the Batson test required the trial court to evaluate whether the "proponent of the preemptory strike is acting out of purposeful discrimination[,]" GR 37(e) requires the trial court to evaluate the exercising party's reasons justifying the peremptory challenge in light of the totality of circumstances. Jefferson, 192 Wn.2d at 249; GR 37(a)-(e). "If the court determines that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied. The court need not find purposeful discrimination to deny the peremptory challenge." GR 37(e). "[A]n objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." GR 37(f).

Because the question of whether an objective observer could view race as a factor in the use of the peremptory challenge is an objective inquiry based on the average reasonable person, our review of the trial court's application of GR 37 is de novo.  Jefferson, 192 Wn.2d at 249-51 ("[W]e stand in the same position as does the trial court, and we review the record and the trial court's conclusions . . . de novo.").

GR 37(g) provides a nonexclusive list of circumstances the court should consider in making its determination:

> (i) the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it;
>
> (ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors;
>
> (iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party;
>
> (iv) whether a reason might be disproportionately associated with a race or ethnicity; and
>
> (v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

GR 37(i) also provides a list of conduct related reasons that may be given for peremptory challenges that historically have been associated with improper discrimination in jury selection and that "the trial court should not accept . . . as reasons for a challenge unless opposing counsel or the court itself can

corroborate the allegations." State v. Omar, 12 Wn. App. 2d 747, 752, 460 P.3d 225 (2020). Those reasons include "allegations that the prospective juror was sleeping, inattentive, or staring or failing to make eye contact; exhibited a problematic attitude, body language, or demeanor; or provided unintelligent or confused answers." GR 37(i).[4]

It is undisputed that juror number nine is a person of color. Cobbs contends the trial court erred in finding that an objective observer could not view race as a factor in striking juror number nine because the prosecutor's reasons for striking juror number nine—his "alleged indecisiveness or impressionability"— are akin to the historical reasons associated with improper discrimination under GR 37(i). Cobbs argues that the prosecutor struck juror number nine "because of his cautious attitude about decision-making, his demeanor, and his equivocal answers." We disagree.

During voir dire, juror number nine was the sole juror who responded in the affirmative to a question the State asked all the jurors: "Does anyone here think they wouldn't be a good juror?" Juror number nine said he would not be a good juror because he is impressionable, has a hard time separating facts, and does not trust himself. When the State asked juror number nine if he would have

---

[4] GR 37(i) provides that "[i]f any party intends to offer one of these reasons or a similar reason as the justification for a peremptory challenge, that party must provide reasonable notice to the court and the other parties so the behavior can be verified and addressed in a timely manner. A lack of corroboration by the judge or opposing counsel verifying the behavior shall invalidate the given reason for the peremptory challenge."

a hard time making decisions and "being confident beyond a reasonable doubt in your decisions," juror number nine said, "Yeah."

Juror number 10's answer differed from juror number nine's. Although juror number 10 expressed concern about finding an innocent person guilty, juror number 10 articulated that if the State produced evidence beyond a reasonable doubt they could be sure of their decision. Juror number 10 never said they were impressionable and easily swayed by others.

The record supports the prosecutor's concern about juror number nine being impressionable. As stated in Washington Pattern Jury Instruction (WPIC) 1.04:

> As jurors, you have a duty to discuss the case with one another and to deliberate in an effort to reach a unanimous verdict. Each of you must decide the case for yourself, but only after you consider the evidence impartially with your fellow jurors. During your deliberations, you should not hesitate to re-examine your own views and to change your opinion based upon further review of the evidence and these instructions. *You should not, however, surrender your honest belief about the value or significance of evidence solely because of the opinions of your fellow jurors. Nor should you change your mind just for the purpose of reaching a verdict.*

WPIC 1.04 (emphasis added). This was not a case where juror number nine was being cautious or equivocal to answers. Juror number nine did not hesitate to identify himself as someone who thought he could not be a good juror because he was someone who, under the circumstances of a trial, could be easily swayed and not confident in his own decisions. Though the trial court made note that juror number nine appeared eager to be excused, that was not the basis for the prosecutor's challenge. The demeanor of juror number nine was not at issue.

17

The prosecutor explained the basis for her peremptory challenge was because of juror number nine's own concerns about his own judgment, which the record supports.

In light of the totality of the circumstances, we determine that an objective observer, who is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination have resulted in the unfair exclusion of potential jurors in Washington State, could not view race as a factor in the prosecutor's peremptory strike.

Cobbs also raises a Batson challenge. Under the Batson analysis, Cobbs argues the prosecutor's peremptory challenge itself established a prima facie case of discriminatory purpose and violated his Fourteenth Amendment right. We disagree. Under the first-prong of the Batson test, to assert a prima facie case of purposeful racial discrimination, the record must establish that a party struck the "sole member of a racially cognizable group." Erickson, 188 Wn.2d at 734. Cobbs contends that juror number nine "was the only identified person of color on the panel."

However, while the record indicates the parties recognized juror number nine as a person of color, nothing in the record indicates that juror number nine was the "sole member of a racially cognizable group" on the jury. Regardless, as previously discussed, the prosecutor provided an adequate race-neutral reason for the challenge, and Cobbs has not established a purposeful discrimination by a preponderance of the evidence. Nor has Cobbs established a prima facie case based on overt racism or a pattern of impermissible strikes.

"A trial judge's decision under the original *Batson* test is entitled great deference and will be reversed only if the defendant can show it was clearly erroneous." Id. at 727. The trial judge's granting of the prosecutor's peremptory challenge of juror number nine was not clearly erroneous.

The peremptory challenge of juror number nine was proper under both GR 37 and Batson.

Motion for Mistrial

Cobbs next argues the trial court abused its discretion by denying his motion for mistrial. "We review the trial court's denial of a mistrial for abuse of discretion." State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). An abuse of discretion occurs " 'when no reasonable judge would have reached the same conclusion.' " Id. (quoting State v. Hopson, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989) (quoting Sofie v. Fibreboard Corp., 112 Wn.2d 636, 667, 771 P.2d 711, 780 P.2d 260 (1989)).

Cobbs argues that it was impermissibly suggestive for Injinmej to see officers escorting him in shackles in the hallway outside the courtroom before she made an in-court identification. Cobbs also argues that seeing him in the hallway tainted Injinmej's in-court identification of Cobbs and rendered the identification unreliable.

We apply a two-part test to determine whether an out-of-court identification is so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification in violation of a defendant's due process rights. State v. Vickers, 148 Wn.2d 91, 118, 59 P.3d 58 (2002). First, the

19

defendant bears the burden of proving "the earlier identification procedure was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' " State v. McDonald, 40 Wn. App. 743, 746, 700 P.2d 327 (1985) (quoting Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247 (1968)); see Vickers, 148 Wn.2d at 118. If the identification procedure was not impermissibly suggestive, our analysis ends. Id.

Second, if the identification procedure was impermissibly suggestive, we review the totality of the circumstances to determine whether the suggestiveness created a substantial likelihood of irreparable misidentification. Neil v. Biggers, 409 U.S. 188, 199-200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). To do so, we weigh the "corrupting effect of the suggestive identification" with the factors indicating reliability that the Supreme Court of the United States established in Biggers: (1) "the opportunity of the witness to view the criminal at the time of the crime"; (2) "the witness' degree of attention"; (3) "the accuracy of the witness' prior description of the criminal"; (4) "the level of certainty demonstrated by the witness at the confrontation"; (5) "and the length of time between the crime and the confrontation." McDonald, 40 Wn. App. at 746; Biggers, 409 U.S. at 199-200; Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). "If the identification evidence possesses certain indications of reliability, its admission will be permitted despite impermissible suggestiveness." Id. (citing Manson, 432 U.S. 98 at 110).

Cobbs argues that it was impermissibly suggestive for Injinmej to see officers escorting him in shackles outside the courtroom before her in-court identification. We disagree.

Our analysis of whether an identification procedure was impermissibly suggestive, unnecessary, and created a substantial likelihood of misidentification is fact specific. Perry v. New Hampshire, 565 U.S. 228, 229-30, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012) ("due process requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.' " (quoting Manson, 432 U.S. 98 at 201)); State v. Smith, 36 Wn. App. 133, 139, 672 P.2d 759 (1983) ("Each case must be decided on its own facts, considering the totality of the circumstances." (citing Biggers, 409 U.S. at 199)).

Cobbs, citing United States v. Emanuele, 51 F. 3d 1123, 1130 (3rd Cir. 1995), acknowledges that the question of "[w]hether subsequent viewings create a substantial risk of misidentification may depend on the strength and propriety of the initial identification." We agree. However, Cobbs asks us to reject the holding in Birch and determine that any time a witness sees a defendant restrained by law enforcement prior to an in-court identification is impermissibly suggestive. We do not read Birch so broadly and decline Cobbs's invitation to make such a determination.

In Birch, officers identified the suspect in a bank robbery by matching his DNA (deoxyribonucleic acid) to samples found in an alley near the bank. 151 Wn. App. at 509. Officers never asked the bank teller witness to identify the

21

suspect in a line-up, show-up, or photomontage. Id. at 510. Before the witness testified at trial, she saw the defendant wearing handcuffs in the hallways outside the courtroom with correction officers. Id. The defendant moved to exclude the witness's in-court identification of him arguing that seeing the defendant in the hallway tainted the identification. Id. The trial court denied the request. Id. The witness testified that she was three feet away from the defendant during the robbery and recognized the defendant because of his eyes. Id.

On appeal, Division Three of this court determined the fact that the witness saw officers escorting the defendant while he was wearing handcuffs "does not demonstrate unnecessary suggestiveness." Id. at 515. The trial court further determined that "[w]ithout other facts showing impermissible suggestiveness, . . . Mr. Birch fails to meet his burden under the first prong of the analysis." Id. (citing Vickers, 148 Wn.2d at 118).

Cobbs criticizes Birch for failing to cite to two federal opinions that determined the primary witness' observations of the defendant restrained prior to the in-court identification was impermissibly suggestive. Emanuele, 51 F. 3d at 1130; United States v. Russell, 532 F.2d 1063, 1069 (6th Cir. 1976). While relying on these holdings, Cobbs ignores significant facts that distinguish Emanuele and Russell from Birch. In Emanuele, it was impermissibly suggestive for the witness to see the defendant in shackles and escorted by two United States Marshals after the victim previously could not identify the defendant in a prior photo array. 51 F. 3d at 1130. In Russell, it was impermissibly suggestive

to allow a witness to observe the defendant in manacles after the witness previously could not identify the defendant from a photograph. 532 F.2d at 1069.

Emanuele and Russell are distinguishable from Birch, where the witness "had never been asked to view a line-up, a photomontage, or identify a suspect." Birch, 151 Wn. App. at 510. As Division Three correctly noted, "[s]how-up identifications are not per se impermissibly suggestive." Id. at 514 (citing State v. Guzman-Cuellar, 47 Wn. App. 326, 335, 734 P.2d 966 (1987)). Cobbs is correct that Guzman-Cuellar involved a showup within hours of the crime, which is distinguishable from both Birch and the instant case. 47 Wn. App. at 328-29. That does not change our analysis that requires us to decide each case on its own facts considering the totality of the circumstances. That is another reason why we do not read Birch so broadly to suggest that a witness observing a restrained defendant prior to an in-court identification is never impermissibly suggestive. See McDonald, 40 Wn. App. 743 (it was impermissibly suggestive where, after witness misidentified defendant in a line-up, an officer told the witness who the defendant was and the witness said it was a "toss up" between the defendant and the suspect he identified, and then the witness saw the defendant in a hallway being escorted by officers before making an in-court identification).

In the instant case, Injinmej's eye contact with the defendant in the hallway was so quick, she did not know whether he was handcuffed or in custody. She also had previously identified him from a photomontage. Under

the totality of the circumstances, Injinmej's observation of the defendant in the hallway was not impermissibly suggestive.

Cobbs also argues it was prejudicial for Injinmej to see Cobbs in shackles for the same reason it is prejudicial for jurors to see defendants in shackles. It is well recognized that restraining a defendant, guarding the defendant with uniformed officers, and requiring the defendant to wear correctional clothing during trial inherently prejudice the jury against the defendant by singling the defendant out as particularly dangerous or guilty. State v. Finch, 137 Wn.2d 792, 845-46, 975 P.2d 967 (1999). A juror asked to determine whether the defendant committed a crime is far different from a witness who saw the suspect commit a crime. Here, Injinmej already saw Cobbs holding a gun and identified him from the photomontage. Whether the complaining witness conceives the defendant as dangerous or guilty is far different than a jury conceiving a prejudice against the accused.[5]

Cobbs next argues the combination of Injinmej seeing Cobbs in the hallway, seeing Cobbs at counsel table, and the fact Cobbs and Injinmej were of different races was impermissibly suggestive. Cobbs relies on United States v. Rogers, 126 F.3d 655, 658 (5th Cir. 1997) (recognizing that it is obviously suggestive when a witness is asked to identify a perpetrator in the courtroom

---

[5] Cobbs also argues, without citation, that witnesses are more susceptible to drawing improper inferences from viewing defendants in shackles than jurors because, unlike jurors, witnesses are do not receive instructions to ignore what they saw. Because this argument is unsupported, we do not consider it. RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

when it is clear who is the defendant and that concerns about suggestiveness is heightened when the defendant is of a different race than the witness (citing Sheri Lynn Johnson, Cross-Racial Identification Errors in Criminal Cases, 69 CORNELL L. REV. 934 (1984)).

In Rogers, the victim of the robbery testified at trial and was not asked to identify the defendant during her initial testimony. Id. at 657. Afterwards, the victim was allowed to be recalled and testify that she was "a hundred percent sure" that the defendant was the robber. Id. This occurred after an FBI agent, at the prosecutor's request, approached the witness after her testimony and discovered she recognized the defendant as the robber when she saw him in court. Id.

In the instant case, the record supports that the complaining witness and the defendant were of different races. However, Injinmej, unlike the witness in Rogers, identified the defendant in a photomontage the same day as the crime long before seeing him in the hallway or in the courtroom. The fact that Injinmej identified a cross-racial defendant in the courtroom under these circumstances did not transform the hallway encounter into one that impermissibly suggested to Injinmej that Cobbs was the perpetrator.

Because the identification procedure was not impermissibly suggestive, our analysis ends here and we need not reach the second prong of the test.

Vickers, 148 Wn.2d at 118.  Accordingly, the trial court did not abuse its discretion in denying Cobbs's motion for a mistrial.

We affirm.

_____Coburn, J._____

WE CONCUR:

_____Chun, J._____     _____Andrus, A.C.J._____